IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GORDON L. STROUP,                    )
                                     )
        Plaintiff,                   )
                                     )
            v.                       )        Civil Action No. 06-94 Erie
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

        Plaintiff, Gordon L. Stroup, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.*  Stroup filed applications for DIB and SSI on January 29, 2004, alleging disability since February 28, 2002, due nerve damage in his neck (Administrative Record, hereinafter "AR", 45-47; 60; 262-263).  His applications were denied, and he requested a hearing before an administrative law judge ("ALJ") (AR 30-33; 35; 265-268).  A hearing was held before an administrative law judge ("ALJ") on August 24, 2005 (AR 269-303).  Following this hearing, the ALJ found that Stroup was not entitled to a period of disability, DIB or SSI under the Act (AR 15-20).  His request for review by the Appeals Council was denied (AR 5-7), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are cross-motions for summary judgment.  For the reasons set forth below, we will deny both motions.

### I. BACKGROUND

        Stroup was born on September 7, 1948, and was fifty-six years old on the date of the ALJ's decision (AR 16; 45).  He is a high school graduate, and previously worked as a retail manager, sales associate, machine assembler and delivery driver (AR 74; 275-277).

        Stroup was evaluated for depression by Kathy Mahood, M.A., on June 16, 1998 (AR 222-

224; 229) pursuant to a referral from his family physician (AR 222). He reported suicidal ideations with no specific plan, emotional detachment, poor appetite, sleep disturbances and poor memory (AR 222). He was diagnosed with rule out major depression, schizoid personality features, and assigned a Global Assessment of Functioning ("GAF") score of 50 (AR 229).[1] He was referred to a physician for medication review and diagnostic impression, and was to return for behavioral and supportive therapy (AR 229).

Stroup returned to Ms. Mahood on July 7, 1998 and reported feeling "stupid" and "worthless" with some suicidal ideations "a couple of times per week" (AR 221). Ms. Mahood reported that his mood was dysphoric, his affect restricted, and although he expressed suicidal ideations, he was able to contract for safety (AR 221). She noted that he was experiencing a number of symptoms of depression including agitation, lethargy, insomnia, sadness and feelings of worthlessness (AR 221).

Stroup also suffered from neck pain, and a cervical spine x-ray conducted on August 2, 2002 revealed degenerative changes involving the lower cervical spine (AR 107). He was seen by Robert Symons, D.O. on the same date for follow up examination, who noted a history of cervical disease (AR 129). Stroup denied suffering from headaches, dizziness, numbness or tingling, but complained of ear pain (AR 129-130). Dr. Symons reported that he was currently without symptoms of depression (AR 130).

An April 21, 2003 CT scan of Stroup's cervical spined showed degenerative disk changes in the mid- and lower cervical spine, which changes were noted as "probably not significantly different when correlated to the patient's previous plain films of the cervical spine" (AR 106). The scan also showed mild to moderate bilateral neural foraminal narrowing at C5-6 (AR 106).

Stroup returned to Dr. Symons on April 8, 2003 for a follow up examination (AR 127). He denied suffering from pain, headaches, dizziness, numbness or tingling, and was on Ibuprofen (AR 127). He did not wish to be treated for depression (AR 128).

---

[1]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

Stroup returned to Dr. Symons on October 8, 2003, and declined to allow further assessment of a positive screen for depression (AR 127).

A November 2003 MRI of Stroup's cervical spine showed degenerative changes at C4-5; disk changes at C5-6 and C6-7; mild foraminal and AP canal stenosis at C5-6; mild broad C6-7 disk protrusion, with mild to moderate AP canal narrowing; mild neural foraminal narrowing; and central bulging at C5-6, without significant neural foraminal stenosis (AR 118).

On December 30, 2003, Stroup was evaluated for physical therapy for complaints of neck pain (AR 114). He reported chronic, intermittent pain which radiated into his ears and down his mid back (AR 114). He claimed his pain was a 7 out of 10, occurred approximately three times per week and rendered him unable to do much more than sit quietly (AR 114). Stroup reported that his pain decreased with rest and Ibuprofen but increased with activity (AR 114). He ambulated independently, had active range of motion in his cervical spine, pain with palpation of the bilateral cervical musculature and mild muscular spasm was noted in the bilateral traverse fibers (AR 114). Stroup's therapist noted that he showed "good rehab potential for stated goals" (AR 114). On December 31, 2003, Stroup requested a therapeutic home exercise program rather than traveling to Erie for therapy (AR 115). He was scheduled for one more session "to go through his program with self advancements" (AR 115).

In December 2003, Dr. Symons requested a neurosurgery consultation for evaluation of Stroup's cervical disk disease (AR 101). Dr. Symons noted that Stroup had no loss of strength, "just pain", and that he was attending physical therapy and using anti-inflammatories (AR 101).

Stroup returned to physical therapy on January 12, 2004 and indicated that his pain level was a 3 out of 10 (AR 120). He reportedly had good short term relief with the use of the modalities and therapeutic exercises (AR 120). He requested continuation of his exercises and cervical heat at home since he had difficulty traveling to the facility (AR 120).

Stroup was evaluated by Vincent Silvaggio, M.D., an orthopedic surgeon in February 2004 (AR 137-138). Stroup relayed a six to seven year history of neck pain which occurred approximately four to six times per week (AR 137). He described the pain as being in his neck into the periscapular region, but denied any problems with numbness, parathesias, gait instability or fine motor coordinate activities of his hands (AR 137). He reported that he had been treated

3

with nonsteroidal anti-inflammatories, and had two sessions of physical therapy without significant relief (AR 137). Physical examination revealed no tenderness to palpation of the midline and cervical spine, good strength in the upper extremities and deep tendon reflexes were bilateral and equal (AR 138). Dr. Silvaggio reviewed his previous diagnostic studies showing degenerative disc disease, but found no evidence of any clinically significant instability (AR 138). He informed Stroup that his symptoms were mainly axial neck pain with no radicular pain and there was no evidence of any weakness (AR 138). Dr. Silvaggio recommended conservative treatment measures and encouraged him to enroll in physical therapy (AR 138).

Cervical spine x-rays conducted on February 27, 2004 showed disk space narrowing at C4-5, C5-6 and C6-7 with significant change in alignment at C4-5 from flexion to extension, suggestive of ligamentous instability (AR 193).

On March 2, 2004, K. Loc Le, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Stroup could occasionally lift and carry up to 20 pounds; frequently lift and carry up to 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; was unlimited in his pushing and pulling abilities; and could occasionally climb, balance, stoop, kneel, crouch and crawl (AR 154-155).

On March 16, 2004, Dr. Symons assessed Stroup with cervical radiculopathy (AR 191). On March 17, 2004, he was evaluated for continued physical therapy treatment (AR 189). He reported that a neurosurgeon recommended continuation of conservative treatment (AR 189). He claimed he had severe discomfort, a pain level of 8/10, limited cervical range of motion, paresthesias and discomfort on the right side of his face (AR 189). The therapist reported that his strength was within normal limits and deep tendon responses were 2/4 in his upper and lower extremities (AR 189). Therapy consisted of moist heat, electrical stimulation and ultrasound (AR 189). Stroup was provided a therapeutic exercise program for cervical range of motion, isometric strengthening and stretching (AR 189).

On March 24, 2004, Stroup reported a decrease in his level of discomfort following modalities, and indicated that his pain level was 3/10 (AR 188). On March 26, 2004, he had some pain relief from therapy, but continued to have numbness on the side of his neck which extended down the paraspinal muscles and into the infrascapular area (AR 187). He claimed that

4

when his pain was present it was severe, but on the date of therapy his pain level was 1/10 (AR 187).

On April 7, 2004, Stroup reported to his therapist no significant change in his level or pattern of discomfort, and rated his pain as 7-8/10 (AR 185). He claimed that exercises did not result in any significant improvement (AR 185). Stroup was discharged from physical therapy secondary to "no progression" (AR 185).

Stroup returned to Dr. Symons for follow up on May 27, 2004 (AR 180). Stroup reported that he had been seen by an orthopedic surgeon in Pittsburgh who had recommended surgery but he declined (AR 180). He was taking Ibuprofen three times a day for pain (AR 180). He rated his pain as a 4, and had no changes in mobility, balance, strength or ability to care for himself (AR 182). Stroup reportedly felt down, depressed and hopeless, and claimed he had little interest or pleasure in doing things (AR 182). Dr. Symons noted that Stroup's positive screen for depression revealed that he did not meet the criteria for major depressive disorder and he had no symptoms requiring intervention (AR 181).

On January 13, 2005, Dr. Symons' treatment notes reflected that pain was "not a problem" on that date, but contained a comment that Stroup had chronic back/neck problems (AR 245). Stroup reported no changes in mobility, balance, strength or ability to care for himself (AR 245). In addition to Ibuprofen, Prozac was added to his medication regime for his depression (AR 244). Stroup declined counseling for his depression (AR 244).

On February 4, 2005, Stoup's Ibuprofen was replaced with Piroxicam (AR 251).

On March 25, 2005, Stroup reported that he had been taking his medication, did not have any side effects, and felt his medications had helped with his depression (AR 238). He again declined counseling (AR 238).

Dr. Symons reported on August 17, 2005 that Stroup's depression was stable (AR 258).

Stroup and a vocational expert testified at the hearing held by the ALJ on August 24, 2005 (AR 269-303). Stroup testified that he was able to drive and required no assistive device to walk (AR 277). He claimed that he suffered from right ear and neck pain which was unpredictable, and that he had good days and bad days (AR 278-280). He testified that he suffered from pain episodes approximately four to five times per week, and when it became

intense, he had to remain motionless for sometimes as long as seven or eight hours (AR 286). Stroup indicated that he was beginning mental health treatment the week after the hearing (AR 282). He testified that he had not sought mental health treatment for approximately five years prior to the hearing (AR 282). He claimed his symptoms were getting worse which prompted him to seek treatment (AR 282). Stroup testified he was able to attend to his personal needs, help with routine household chores, but no longer had any interest in outside activities or hobbies (AR 283-284). He claimed to have sleep problems and a lack of energy (AR 289).

The vocational expert testified that Stroup's skills from his past position as a retail manager were transferable to sedentary and light jobs which were semi-skilled in nature, including the positions of order clerk and inventory control clerk at the sedentary exertional level, and customer service clerk at the light exertional level (AR 298-300). The vocational expert further testified that these positions would be eliminated if such an individual was limited to simple, repetitive, routine type tasks (AR 300-301). Finally, the vocational expert testified that only the customer service position would be eliminated if such an individual was limited to no more than incidental interaction with the public (AR 301).

After the administrative hearing, Stroup was seen by James Cousins, a social worker, on August 29, 2005 for complaints of depression (AR 255). Mr. Cousins reported that Stroup was initially seen in June 1998, kept one appointment, then dropped out of treatment (AR 255). He reportedly continued to struggle with feelings of hopelessness and helplessness, anger, suicidal thoughts and isolation (AR 256). He claimed he felt no effect from the Prozac (AR 256). Mr. Cousins diagnosed him with dysthmia, and referred him to Carol Teresi for medication review (AR 256).

Stroup was seen by Carol Teresi, CRNP on September 2, 2005 for treatment of depression (AR 252). He reported that Prozac had been of no benefit to him since he started taking it in January 2005 (AR 252). He claimed he felt hopeless, had low energy, lied on the couch all day, was irritable and easily frustrated and "could not imagine going out to work" (AR 252). On mental status examination, Ms. Teresi reported he had mild anxiety, his mood was down, he was appropriate and logical, his thoughts were relevant, and his concentration, impulse control and judgement were good (AR 253). She found his insight fair, since he had been

depressed "a long time and did not seek help" (AR 253).  She diagnosed Stroup with major depression, recurrent, severe without psychosis, rule out dysthymia, rule out generalized anxiety disorder or other anxiety disorder, and assigned him a GAF score of 50 (AR 253).  Ms. Teresi discontinued the Prozac and started Celexa (AR 254).

Following the submission of the recent mental health treatment records, the ALJ issued a written decision which found that Stroup was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 15-20).  His request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-7).  He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971).  It has been defined as less than a preponderance of evidence but more than a mere scintilla.  *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity.  42 U.S.C. § 423(d)(1)(A).  Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels.  42 U.S.C. § 1382(a).  A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI.  *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a).  In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c).  The ALJ found that Stroup met the disability insured status requirements of the Act (AR 16).  SSI does not have an insured status

requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3ʳᵈ Cir. 1985).

*Jesurum*, 48 F.3d at 117.

The ALJ resolved Stroup's case at the fifth step. At step two, the ALJ determined that his degenerative disc disease was a severe impairment, but determined at step three that he did not meet a listing (AR 17). At step four, the ALJ determined that he could not return to his past work, but retained the residual functional capacity to perform work at the light exertional level (AR 18). At the final step, the ALJ determined that Stroup could perform the jobs cited by the vocational expert at the administrative hearing (AR 19). The ALJ additionally determined that his allegations regarding his limitations were not totally credible (AR 19). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Stroup argues that the ALJ erred in not fully crediting his testimony as to his functional limitations resulting from his subjective complaints of pain, erred in his evaluation of the medical evidence with respect to his alleged mental impairment, and erred in finding that he has the

residual functional capacity to perform light work.  He also challenges the ALJ's reliance on the testimony of the vocational expert, since the hypothetical posed to the vocational expert did not include all of his alleged functional limitations.  We shall address each of these arguments in turn.

    *A.  Credibility determination*

    Stroup first argues that the ALJ erred in evaluating his subjective complaints of pain and in finding that his testimony was not entirely credible.  Testimony of subjective complaints of pain is entitled to great weight, particularly when supported by competent medical evidence. *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3rd Cir. 1979).  Where such testimony is reasonably supported by medical evidence, an ALJ may not discount such evidence without contrary medical evidence.  *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981).  Even when not fully confirmed by objective medical evidence, subjective complaints must be seriously considered. *Id.* at 972; *see also Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir.1984).  Although the ALJ is required to give great weight to the claimant's testimony of subjective complaints of pain, he has the discretion to reject partially, or even entirely, such subjective complaints if they are not fully credible.  *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir.1974).

    When considering subjective complaints, the ALJ is entitled to discredit a claimant's testimony, but must state the facts upon which the conclusion is based, which must be both clear and reasonable.  *Atkins v. Bowen*, 690 F. Supp. 383, 389 (E.D.Pa.1988).  Relevant factors include the claimant's statements, appearance, and demeanor; medical signs and laboratory findings; treatment and response; and physicians' opinions regarding credibility and severity of claimant's subjective complaints.  *See Social Security Ruling ("SSR")* 96-7p, 1996 WL 374186 at *3.  The ALJ is also constrained to consider only those complaints of pain or other symptoms which can reasonably be accepted as consistent with the objective medical evidence, and other evidence.  20 C.F.R. § 416.929(a).  Moreover, the claimant must produce medical signs and laboratory findings showing the existence of a medical impairment which results from anatomical, physiological, or

9

psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Deference must be given to the ALJ's determination in issues of credibility when reviewing the Commissioner's final decision, so long as the ALJ discusses the issue and his finding is supported by substantial evidence. *Alvarez v. Secretary of Health and Human Services*, 549 F. Supp. 897, 899-900 (E.D.Pa.1982).

We find that the ALJ evaluated Stroup's subjective complaints of pain consistent with the above standards. The ALJ recognized that Stroup had a history of low back pain secondary to degenerative disc disease at C4-5, C5-6 and C6-7, mild foraminal and canal stenosis at C5-6, mild broad C6-7 protrusion with mild to moderate canal narrowing and mild neural foraminal narrowing, and central bulging at C5-6, which was confirmed by a CT scan and MRI of the cervical spine (AR 17). The ALJ nonetheless concluded that Stroup's assertions concerning his limitations were not totally credible (AR 19). In support of his conclusion, the ALJ pointed to Dr. Salvaggio's evaluation in February 2004, wherein Stroup denied numbness, paresthesias, gait instability, and poor fine motor coordination, and stated that he had only been treated with Ibuprofen (AR 17). He noted that Dr. Salvaggio's physical examination revealed that Stroup was in no acute distress, had no tenderness and had good strength and sensation (AR 17). The ALJ further noted that while progress notes showed he sought treatment for neck pain, he admitted Tylenol controlled his pain and his physical examinations were unremarkable (AR 17).

Based upon the ALJ's discussion of the evidence, we find that the ALJ's determination that Stroup's testimony was not fully credible is supported by substantial evidence. The treatment notes do not depict a totally disabling neck and back impairment. For example, while Stroup complained of pain at his initial physical therapy evaluation, his therapist opined that he showed "good rehab potential for stated goals" (AR 114). In February 2004, he denied any problems with numbness, parathesias, gait instability or fine motor coordinate activities of his hands, his physical examination was unremarkable and Dr. Salvaggio found no evidence of any clinically significant instability (AR 137-138). In May 2004 and January 2005, he reported no

changes in mobility, balance, strength or ability to care for himself (AR 182; 245).

We reject Stroup's argument that the ALJ's credibility determination is flawed since multiple treatment attempts were taken without control of his symptoms, and years of treatment records corroborate severe pain episodes. *Plaintiff's Brief* pp. 9-10; 12). To the contrary, Stroup's conservative treatment history supports the ALJ's determination that his subjective complaints were not entitled to full credence. The record reflects that his condition was not serious enough to warrant surgical intervention (AR 138), and that he actively participated in physical therapy for a limited time frame, preferring instead to undergo a home exercise program (AR 115), and that he took no more than basic anti-inflammatories for several years (AR 101; 127; 137; 180; 251). Moreover, treatment notes reflect that on several occasions Stroup reported that pain was not a problem for him (AR 203; 208; 245).

Nor are we persuaded that the ALJ committed error by failing to fully credit Stroup's complaints of debilitating pain based on his work history. *See Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3rd Cir. 1981) (noting that, when claimant has worked for a long period of time, his testimony about his work capabilities should be accorded substantial credibility). Despite concluding that Stroup's complaints were not entirely credible, the ALJ did not totally discount them. Rather, he credited them to the extent that he determined that Stroup could not return to his past relevant work and reduced his residual functional capacity to light work. We therefore find no error in the ALJ's credibility assessment.

B.    *Evaluation of medical evidence relative to Stoup's alleged mental impairment*

We reach a different result however, with respect to the ALJ's evaluation of the medical evidence relating to Stroup's alleged mental impairment. Stroup claims that the ALJ failed to analyze his September 2005 mental health evaluation, specifically the assessed GAF score of 50. *Plaintiff's Brief* p. 12. We agree. The ALJ stated at the administrative hearing that the "key to the case" revolved around Stroup's mental health situation, and he considered a mental health evaluation "imperative" in resolving Stroup's claim (AR 301). In his decision, however, the ALJ

11

makes no more than a passing reference to the September 2005 evaluation, concluding that no evidence suggested that his alleged depression imposed any significant limitations.  The ALJ did not address Stroup's GAF score of 5O in his determination, which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

Pursuant to the final rules of the Social Security Administration, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements."  66 *Fed.Reg.* 50746, 50764-65 (2000).  Nonetheless, the GAF remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis."  *Id.*  As such, "it constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability."  *Colon v. Barnhart*, 424 F. Supp. 2d 805, 812 (E.D.Pa. 2006); *see also Santiago-Rivera v. Barnhart*, 2006 WL 2794189 at *9 (E.D.Pa. 2006) (case remanded since claimant's GAF score of 50 indicated serious symptoms and ALJ failed to discuss score); *Span v. Barnhart,* 2004 WL 1535768 at *7 (E.D.Pa. 2004) (absent from ALJ's discussion was any meaningful indication of how he considered claimant's GAF scores or discounted their significance); *Escardille v. Barnhart,* 2003 WL 21499999 at *7 (E.D.Pa. 2003) (case remanded because ALJ failed to mention claimant's GAF score of 50 which constituted a specific medical finding that claimant unable to perform competitive work).

The Commissioner argues that even if the September 2005 mental health evaluation were sufficient to show that Stroup had significant mental limitations, he would not be able to meet the Act's strict durational requirement, namely, that an individual cannot be found disabled unless he is unable to perform any substantial gainful activity for at least twelve months.  *Defendant's Brief* p. 20.  While the Commissioner may be correct, the fact remains that the ALJ did not articulate any reason for his apparent rejection of the GAF score, and we may only review the decision on the basis upon which it was made.  *Fargnoli v. Halter,* 247 F.3d 43, 43-44 n.7 (3rd Cir. 2001)

("the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based"); *see also Robletto v. Barnhart,* 2006 WL 2818431 at *9 n.7 (E.D.Pa. 2006) (rejecting Commissioner's argument that GAF score did not reflect a historical view of the claimant's level of functioning for a twelve month period, noting that even if the ALJ chose to discount the claimant's score on that basis, this did not relieve his obligation to address his reasons for doing so in his opinion).

Because the ALJ is required to give some reason for discounting the evidence he rejects, *see Adorno v. Shalala,* 40 F.3d 43, 48 (3rd Cir. 1994), and the ALJ's decision here fails to address the 2005 GAF score evidence, we are unable to conclude that his decision is supported by substantial evidence.  Given the potential materiality of Stoup's GAF score, we are of the opinion that a remand is appropriate so that the ALJ can specifically address this evidence.

> C.      *RFC and Vocational Expert testimony*

Finally, Stroup contends that the ALJ erred in his residual functional capacity determination and erred in relying on the testimony of the vocational expert.  Since we have determined that remand is appropriate with respect to Stroup's alleged mental impairment, we need not address the ALJ's RFC determination, inasmuch as the ALJ will necessarily re-evaluate Stroup's RFC in the course of considering the evidence of his mental impairment.  Likewise, we need not resolve the adequacy of the ALJ's hypothetical at this time.

## IV. CONCLUSION

Based upon the foregoing reasons, Stroup's motion for summary judgment shall be denied, and the Commissioner's motion for summary judgment shall be denied.  The matter shall be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion.  In addition to the ALJ's reexamination of the evidence relative to Stroup's alleged mental impairment, the ALJ is free to seek additional evidence and/or call a vocational expert if he feels it is necessary.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GORDON L. STROUP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-94 Erie |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>ORDER</u>**

AND NOW, this 15th day of November, 2006, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 9] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 11] is DENIED.  The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.


s/ Sean J. McLaughlin
United States District Judge


cm: All parties of record.

14